United States District Court
Southern District of Texas

**ENTERED**

March 18, 2026

Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | |
|---|---|
| LAUREE THOMAS, § | |
| § | |
| Plaintiff. § | |
| § | |
| V. § | CIVIL ACTION NO. 3:25-cv-00209 |
| § | |
| MAJKA WOODS, *et al.*, § | |
| § | |
| Defendants. § | |

**MEMORANDUM AND RECOMMENDATION**

Pending before me is Defendants' Second Amended Motion to Dismiss Plaintiff's Second Amended Complaint. Dkt. 79. Having reviewed the briefing, the record, and the applicable law, I recommend that the motion be granted.

**BACKGROUND[1]**

This is an employment discrimination dispute. Plaintiff Lauree Thomas, an African American woman, worked for Defendant University of Texas Medical Branch ("UTMB") from 2001 to 2024. Defendants are UTMB and the following individuals: UTMB Vice Dean for Academic Affairs Majka Woods; UTMB then-Acting Dean Jeffrey L. Susman; UTMB Interim Chief Human Resources Officer Philesha Evans; Dean of UTMB's John Sealy School of Medicine Charles P. Mouton; UTMB President Jochen Reisner; and University of Texas System Chancellor (ad interim) John Zerwas (collectively, the "Individual Defendants").

Thomas started at UTMB as an Associate Dean for Admission and Student Affairs in the UTMB/John Sealy School of Medicine. On December 2, 2020, UTMB appointed Thomas as Associate Dean for Student Diversity, Health, Inclusion, and

---

[1] This background section is taken from the live pleading, Plaintiff's Second Amended Complaint. Dkt. 77. At the motion to dismiss stage, I am required to accept "all well-pleaded facts as true, viewing them in the light most favorable to [Thomas]." *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (quotation omitted).

Equity. In her role as Associate Dean, Thomas reported to Dr. Alfredo Torres, UTMB's Chief Diversity Officer in its Office of Faculty Affairs and Professional Development.

According to Thomas, UTMB and its officials had predetermined as early as December of 2022 that they wanted to terminate Thomas's employment. In one instance, Susman met with Torres and Woods to discuss Diversity, Equity, and Inclusion ("DEI") initiatives and UTMB's progress towards those initiatives. At some point after this meeting, Torres told Thomas that Susman and Woods had asked Torres to falsify Thomas's performance evaluation so they could fire Thomas. Torres refused to falsify Thomas's performance evaluation.

In April 2023, Susman and Woods held a meeting with Thomas, voiced strong support for DEI initiatives, and committed to continue DEI work at UTMB. In this meeting, Woods informed Thomas that she would be reassigned to the Office of Academic Affairs, where she would report directly to Woods effective May 1, 2023. Thomas was not, however, given a new job description, designated salary, or specific job duties in connection with this reassignment.

In June 2023, shortly after Thomas's reassignment, the Texas Legislature passed Senate Bill 17 ("SB 17"), which prohibits public universities from establishing or maintaining DEI offices. Thomas's DEI office was dismantled; Thomas was relieved of responsibility for DEI functions; and Thomas no longer supervised DEI employees. Woods never met with Thomas to discuss Thomas's new role and responsibilities in the Office of Academic Affairs. For five months following Thomas's reassignment, Woods: (1) did not assign Thomas duties or work responsibilities, (2) provided Thomas no direction on how she should function or what her role would be, (3) did not invite Thomas to Operations Committee meetings or other departmental meetings, (4) did not introduce Thomas to other staff and employees in the Office of Academic Affairs, and (5) did not introduce Thomas as a new member of the Office of Academic Affairs during an all-staff meeting at which all other Academic Affairs staff were introduced.

In September 2023, Woods told Thomas that she was concerned about Thomas's future at UTMB because she had no position to offer Thomas going forward. In November 2023, UTMB held a Zoom meeting with all its DEI officers and senior-level administrators instructing them to find new names for their offices, but to continue their work as DEI officers under different titles. DEI employees at other UT-System institutions, such as UT-Houston, UT-Southwestern, UT-San Antonio, and UT-Tyler, were reassigned or invited to reapply for positions under new titles. Several unidentified DEI employees who worked with Thomas at UTMB were given other job responsibilities to absorb the percentage of time they had spent in DEI related activities. Around this time, Thomas proposed renaming her office as the Office of Student Professional Development and Cultural Engagement, but Woods rejected Thomas's proposal and indicated that there was no need for a new office title.

On December 8, 2023, Woods gave Thomas termination papers. That same day, UTMB revoked Thomas's campus and office access, preventing her from accessing her office, emails, and files. On January 17, 2024, Thomas filed a charge of discrimination (the "Charge") with the Equal Employment Opportunity Commission. On January 23, 2024, UTMB sent Thomas a letter extending her termination date via certified mail. The letter was dated January 12, 2024. On that extension letter, Woods made a handwritten note stating that the letter was being sent at the request of the human resources department.  On February 21, 2024, Thomas filed an internal complaint against Woods and UTMB challenging her termination on discriminatory grounds. The next week, on February 28, 2024, UTMB terminated Thomas's employment.

On July 3, 2025, Thomas instituted this lawsuit. In the Second Amended Complaint, Thomas brings six causes of action against UTMB under Title VII: (1) race discrimination; (2) color discrimination; (3) sex/gender discrimination; (4) retaliation; (5) constructive discharge; and (6) hostile work environment.

3

Thomas also asserts five causes of action for constitutional violations against the Individual Defendants: (1) 42 U.S.C. § 1981 discrimination in contracting; (2) Fourteenth Amendment race discrimination; (3) First Amendment retaliation; (4) Fourteenth Amendment due process violations; and (5) conspiracy to violate constitutional rights.

Defendants move to dismiss all claims against them, asserting that Thomas fails to state a claim that would entitle her to relief.

## RULE 12(b)(6) MOTION TO DISMISS

A defendant may move to dismiss a complaint when a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). Conversely, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (cleaned up).

When evaluating a Rule 12(b)(6) motion, I accept "all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 948 F.3d 673, 675 (5th Cir. 2020) (quotation omitted). I "do not, however, accept as true legal conclusions, conclusory statements, or naked assertions devoid of further factual enhancement." *Benfield v. Magee*, 945 F.3d 333, 336−37 (5th Cir. 2019) (cleaned up). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do

not suffice." *Iqbal*, 556 U.S. at 678. The Fifth Circuit "hold[s] pro se plaintiffs to a more lenient standard than lawyers when analyzing complaints, but pro se plaintiffs must still plead factual allegations that raise the right to relief above the speculative level." *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016); *see also Twombly*, 550 U.S. at 555.

## ANALYSIS

### A.    TITLE VII CLAIMS (UTMB)

#### 1.    *Discrimination Claims*

Title VII prohibits employers from discriminating against any individual based on race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2(a)(1). Thomas alleges that UTMB discriminated against her based on her race, color, and gender. *See* Dkt. 77 at 20–23. Thomas bases her discrimination claims on a disparate treatment theory. "Disparate-treatment discrimination addresses employment actions that treat an employee worse than others based on the employee's race, color, religion, sex, or national origin. In such disparate-treatment cases, proof and finding of discriminatory motive is required." *Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006).

Discriminatory motives may be shown through direct evidence of that motive, meaning "any statement or written document showing a discriminatory motive on its face." *Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325, 329 (5th Cir. 1994). Alternatively, discriminatory motive may be shown through circumstantial proof. Although Thomas "do[es] not have to submit evidence to establish a prima facie case of discrimination at this stage, [she] must plead sufficient facts on all of the *ultimate elements* of a disparate treatment claim to make [her] case plausible." *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019). The ultimate elements of a disparate treatment claim are: (1) "an 'adverse employment action,' (2) taken against a plaintiff '*because of* her protected status.'" *Id*. at 767 (quoting *Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 576 (5th Cir. 2004)).

5

Here, each of Thomas's discrimination claims fail because Thomas does not make any allegations that suggest a discriminatory motive.

### a.    Race Discrimination

Thomas alleges that UTMB discriminated against her based on her race because it: (1) terminated Thomas but retained unidentified, non-minority DEI employees and allowed Dr. Torres to continue in his position for six additional months; (2) excluded Thomas from her work and professional activities while unidentified, non-minority colleagues were integrated and received invitations to committees and task forces; (3) blocked Thomas's title change that was offered to other DEI employees; (4) requested falsification of Thomas's performance evaluation to provide grounds for termination; (5) predetermined Thomas's termination one year before SB 17 implementation; (6) denied Thomas standard and customary procedures offered to other employees; and (7) denied Thomas access to alternative employment positions. *See* Dkt. 77 at 20–22. Notably missing from these allegations are any facts supporting an inference that any of these actions took place on account of race.

The parties do not dispute that one of the adverse employment actions at issue is Thomas's termination. *See* Dkt. 79 at 6. Starting with this point, UTMB correctly identifies that Thomas fails to allege facts "from which the Court could conclude that [Thomas's termination] occurred 'because of' [Thomas]'s protected status." Dkt. 79 at 7. Thomas offers no direct evidence of discriminatory intent. Instead, she relies on circumstantial allegations that other employees involved in DEI initiatives were treated more favorably. To support a disparate-treatment theory, however, Thomas must identify *similarly situated* employees outside of her protected class who received more favorable treatment. *See Raj v. La. State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013). Thomas fails to do so.

First, Thomas references unidentified DEI employees at other University of Texas System institutions who allegedly retained their positions. Dkt. 77 at 14. But the Second Amended Complaint does not identify those employees, their roles, or

their protected characteristics. Without such information, I cannot plausibly infer that any of those employees were similarly situated or treated more favorably because of their race. *See Hendrix v. iQor Inc.*, No. 3:20-cv-0437, 2021 WL 3040776, at *5 (N.D. Tex. June 7, 2021) (Plaintiff "does not identify particular employees or describe specific situations involving similarly situated non-African American employees, who were treated more favorably.").

Second, Thomas identifies several UTMB employees who "were allowed to continue in their positions under different titles or reassignments."[2] But Thomas does not allege the race of these individuals or describe how they are similarly situated to her. Without knowing whether these individuals were similarly situated to Thomas but of a different race, I cannot plausibly infer that any difference in treatment occurred because of race. *See Graham v. Bluebonnet Trails Cmty. Servs.*, 587 F. App'x. 205, 207 (5th Cir. 2014) ("Without similarly situated comparators of a different race who were allegedly treated more favorably, there is no basis for a factfinder to infer discrimination."); *Franklin v. City of Slidell*, 936 F. Supp. 2d 691, 706 (E.D. La. 2013) (dismissing race discrimination claims because "Plaintiff has neither alleged that he was replaced by a non-African American nor that he was treated any differently than similarly situated non-African American employees.").

Thomas also attempts to compare herself to her supervisor, Torres, who continued working after Thomas's employment was terminated. *See* Dkt. 77 at 14. Yet, Thomas fails to explain how Torres is similarly situated to her. "A comparator typically must share the same supervisor, not be plaintiff's supervisor." *Holmes v. Univ. of Tex. at Austin*, No. 1:24-cv-1135, 2025 WL 4642495, at *3 (W.D. Tex. Sep. 2, 2025); *see also Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) ("The employment actions being compared will be deemed to have been taken

---

[2] Thomas identifies Dr. Denny Fe Agana, Dr. Cindy West, Daniel Jupiter, Dr. Jose Rojas, and Norms Perez as UTMB DEI employees who did not lose their employment but were given other job responsibilities to absorb the time previously spent on DEI activities. *See* Dkt. 77 at 15.

under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person.").

UTMB and Thomas argue at length about whether UTMB had legitimate, non-discriminatory reasons for terminating Thomas and whether those reasons are pretextual. *See* Dkt. 79 at 9–11; Dkt. 85 at 7–8. But "whether [UTMB] had a legitimate, nondiscriminatory reason for [terminating Thomas] is not pertinent until the summary judgment stage, and even then, only *after* [Thomas] establishes h[er] prima facie case." *Jenkins v. City of Dallas*, 717 F. Supp. 3d 528, 538 (N.D. Tex. 2024). The arguments made on both sides are premature. Thomas is correct that she is not required to disprove each possible legitimate explanation for her termination at this stage. But she must first sufficiently allege the ultimate elements of her claim. She fails to do so.

Thomas argues in her response to UTMB's motion to dismiss that her "[April 2023] Reassignment Without Duties" and "December 8, 2023 Lockout" constitute separate adverse employment actions distinct from her termination. *See* Dkt. 85 at 8–9. Yet, neither of those adverse employment actions salvages her discrimination claims. There is still an absence of well-pleaded allegations to raise an inference, much less a plausible one, that her alleged reassignment or lockout had anything to do with her race. Thomas argues that her allegation that "no one else was treated that way" establishes differential treatment. *See id.* at 10. Even if I accept, as true, that "no one else was treated that way," mere differential treatment is insufficient to establish that a similarly situated person outside of Thomas's protected classes was treated more favorably than she was under similar circumstances. Nor do Thomas's repeated references to "non-minority DEI employees" move the needle. *See* Dkt. 77 at 2, 20. Half of Thomas's references to her "non-minority colleagues" refer to these individuals as "younger," suggesting that they are not similarly situated to Thomas in terms of experience. *See id.* at 2, 9, 11, 20, 21.

8

Without a similarly situated comparator, Thomas fails to raise a plausible inference that any adverse action taken against her was taken *because of* her race. Accordingly, Thomas's race discrimination claim must be dismissed.

### b.    Gender Discrimination

As to Thomas's gender discrimination claim, she recycles many of the same allegations advanced in her race discrimination claim as support. These allegations are equally deficient. Thomas does not point to a similarly situated comparator whose different treatment would suggest that Thomas suffered any adverse action because of her gender. In fact, Thomas's gender discrimination claim is undermined by her identification of male *and female* UTMB DEI employees who were given other job responsibilities after DEI functions were curtailed. *See id.* at 15. The fact that other women did not lose their employment prevents me from inferring that Thomas's employment was terminated because of her gender. Thus, Thomas's gender discrimination claim should also be dismissed.

### c.    Color Discrimination

As to Thomas's color discrimination claim, Thomas asserts only that "Defendants *may* have treated her differently based on her color." *See id.* at 22 (emphasis added)). "Color discrimination arises when the particular hue of the plaintiff's skin is the cause of the discrimination, such as in the case where a dark-colored African-American individual is discriminated against in favor of a light-colored African-American individual." *Whittington v. Harris County*, No. 24-20172, 2025 WL 1864956, at *3 (5th Cir. July 7, 2025) (quoting *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 n.5 (4th Cir. 2002)). Thomas fails to address the color of her own skin, much less any possible comparator. Accordingly, Thomas fails to state a plausible color discrimination claim. *See, e.g.*, *Khan v. City of Houston*, No. 4:23-cv-00998, 2024 WL 4829496, at *4 (S.D. Tex. Nov. 19, 2024), *appeal dismissed*, No. 24-20564, 2025 WL 1694903 (5th Cir. Mar. 20, 2025) (holding that the plaintiff failed to allege a color discrimination claim distinct from his racial

9

discrimination claim where "none of [his]] factual allegations mention his skin tone").

### 2.   *Retaliation Claim*

Title VII's anti-retaliation provision forbids UTMB from taking adverse employment action against Thomas because she opposed practices made unlawful by Title VII. *See* 42 U.S.C. § 2000e-3(a). To state a retaliation claim, Thomas must allege (1) "that she engaged in a protected activity;" (2) "that an adverse employment action occurred;" and (3) "that a causal link existed between the protected activity and the adverse action." *Baker v. Am. Airlines, Inc.*, 430 F.3d 750, 754 (5th Cir. 2005). Thomas "does not have to submit evidence to establish a prima facie case at the pleading stage." *Wright v. Union Pac. R.R. Co.*, 990 F.3d 428, 433 (5th Cir. 2021) (cleaned up). Rather, Thomas must "plead facts permitting a reasonable inference that [UTMB] terminated her because of her [protected activities]." *Id.* "At the pleading stage, this means that [Thomas is] required to allege facts permitting at least an inference of her [UTMB]'s knowledge of her protected conduct in order to establish the required causal link between her conduct and the alleged retaliation." *Id.* at 434.

Thomas alleges retaliation based on two events: (1) her filing a Charge on January 17, 2024; and (2) her filing an internal complaint on February 21, 2024.[4]

Neither party disputes that Thomas engaged in protected activities and that an adverse employment action occurred—the termination of Thomas's

---

[4] In her live pleading, Thomas also alleges that she filed unspecified "internal complaints about discriminatory treatment before September 2023." Dkt. 77 at 23. Although neither party addresses internal complaints made before September 2023 in the motion to dismiss briefing, I find such bare-boned allegations are insufficient to permit a reasonable inference that a causal link existed between such internal complaints and her termination. Thomas offers no explanation as to what alleged "discriminatory treatment" her internal complaints concerned. More importantly, Thomas fails to allege when the internal complaints were made—other than some time before September 2023. Without any more specifics, I am unable to plausibly tie those internal complaints—which could have taken place from the start of her employment at UTMB in 2001 to August 2023—to her termination.

10

employment. The heart of this dispute is whether Thomas has plausibly alleged that a causal link exists between the protected activities and her termination.

UTMB argues that Thomas's retaliation claim fails on three grounds: (1) "UTMB informed Plaintiff that her position would be eliminated in September of 2023, months before she engaged in her protected activities in January and February of 2024"; (2) "[a]n adverse employment action that is decided and documented before protected activity occurs cannot, as a matter of law, support a retaliation claim"; and (3) Thomas "does not allege that her supervisor (Dr. Woods) knew of her internal complaint." Dkt. 79 at 13–14.[5]

Thomas filed her Charge on January 17, 2024. *See* Dkt. 77 at 23. She alleges the "termination extension letter was dated January 12, 2024, but was not mailed until January 23, 2024 (six days after the EEOC charge)." *Id*. Thomas also alleges that "Dr. Woods hand-wrote on [the termination extension] letter: 'Please note that this is being sent at the request of HR.'" *Id*. at 13. In a nutshell, Thomas contends that "HR involvement indicated by the hand-written notation suggests decisions made in response to [Thomas's] protected activity, not in accordance with standard and customary practices and procedures." *Id*. at 24.

Thomas's retaliation claim based on filing her Charge fails. In essence, Thomas theorizes that because the letter extending her termination was sent *after* she filed a charge, it likely was sent in *response* to her filing the charge. Even if true, that is irrelevant. *Extending* Thomas's employment was not an adverse employment action. The adverse employment action was Woods's terminating Thomas's employment. Woods gave Thomas termination papers on December 8, 2023—more than a month *before* Thomas filed her Charge. "Employers need not suspend previously planned [terminations] upon discovering that a Title VII suit

---

[5] UTMB also argues, relying on a Notice of Charge of Discrimination it attaches to its motion to dismiss, that Thomas's retaliation claim is defective because she "filed an EEOC charge alleging a discharge that had not yet occurred, underscoring that the charge could not have been prompted by the later termination decision." *Id*. at 14. I see no need to consider this evidence because it does not affect my analysis of Thomas's retaliation claim.

has been filed, and their proceeding along lines previously contemplated . . . is no evidence whatever of causality." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001). Because Thomas's allegations make clear that her termination was contemplated and decided well before she filed her Charge, I cannot plausibly infer causality between the Charge and any adverse employment action. Nor can I infer causality between Thomas's termination and her February 21, 2024 internal complaint. Both of these protected activities occurred after Thomas's termination had already been set in motion. Thus, Thomas fails to state a retaliation claim.

### 3.    Constructive Discharge Claim

Thomas claims that UTMB constructively discharged her by creating intolerable working conditions. As the Supreme Court has explained:

> The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his "working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004). When the employee resigns in the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge.

> A claim of constructive discharge therefore has two basic elements. A plaintiff must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign. **But he must also show that he actually resigned**.

*Green v. Brennan*, 578 U.S. 547, 555 (2016) (emphasis added) (cleaned up). It is undisputed that Thomas did not resign—her employment was terminated. Because Thomas did not resign, she cannot bring a constructive discharge claim. *See Feds for Med. Freedom v. Garland*, No. 4:23-cv-1817, 2024 WL 1859958, at *9 (S.D. Tex. Apr. 29, 2024) (collecting cases).

### 4.    Hostile Work Environment Claim

Thomas alleges that UTMB created a hostile work environment through: (1) "systematic exclusion . . . from work, meetings, professional relationships, departmental integration, office access, and email access treatment"; (2) "falsification of performance evaluation"; (3) "blocking of accommodations"

offered to other employees; (4) "retaliation for protected complaints"; (5) "predetermined termination"; and (6) "denying Dr. Thomas standard and customary practices and procedures afforded to other employees." Dkt. 77 at 26. UTMB argues that Thomas's claim fails because she "does not allege anything that was actually hostile." Dkt. 79 at 15.

To state a claim for a hostile work environment under Title VII, Thomas must allege that she: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on a protected characteristic; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) UTMB knew or should have known of the harassment in question and failed to take prompt remedial action. *See Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). This "standard is not easy to meet. Rather, these 'factors are sufficiently demanding to ensure that Title VII does not become a general civility code.'" *Friend v. McAdams*, 861 F. App'x. 825, 831 (5th Cir. 2021) (quoting *West v. City of Houston*, 960 F.3d 736, 742 (5th Cir. 2020)). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

The alleged falsification of Thomas's performance evaluation, retaliation, and termination are "isolated incidents," which are not actionable. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Additionally, retaliation and termination, "although considered adverse employment actions . . . , are not offensive or harassing in the way necessary to support a hostile work environment claim." *Montgomery-Smith v. George*, 810 F. App'x. 252, 259 (5th Cir. 2020).

As to the alleged systematic exclusion, blocking of accommodations, and denial of standard and customary practices and procedures, these are not hostile

or abusive actions. Even if these actions could be considered harassing, Thomas alleges no facts that would give rise to the plausible inference that any such treatment occurred because of a protected characteristic. Without evidence of harassment based on a protected characteristic, Thomas cannot satisfy the third element of a hostile work environment claim. *See Friend*, 861 F. App'x. at 831 (dismissing hostile work environment claims where plaintiff did not offer "evidence suggesting these actions were 'based on' her race and sex"). Thus, Thomas fails to state a claim for hostile work environment.

## B.    SECTION 1983 CLAIMS (INDIVIDUAL DEFENDANTS)

Thomas brings five § 1983 claims against the Individual Defendants in their individual capacities.[7] Those claims are: (1) § 1981 violation for race discrimination in contracting;[8] (2) Fourteenth Amendment race discrimination; (3) First Amendment retaliation; (4) Fourteenth Amendment due process violations; and (5) conspiracy to violate constitutional rights.

### 1.    *Section 1983*

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of

---

[7] The court has already dismissed Thomas's § 1981 and § 1983 claims against UTMB and the Individual Defendants in their official capacities. *See* Dkt. 45 at 2.

[8] Section 1981 does not create a private cause of action against government officials in their individual capacities. *See Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 731 (1989). Thomas may, however, "pursue a § 1983 cause of action against persons acting under color of state law in order to assert [her] substantive rights under § 1981." *Oden v. Oktibbeha County*, 246 F.3d 458, 462 (5th Cir. 2001). Accordingly, I construe Thomas's Equal Rights Act claim as one seeking to vindicate her substantive § 1981 rights through the procedural vehicle of § 1983. *See Stading v. Tex. A&M Univ.-Texarkana*, No. 5:24-cv-00066, 2025 WL 748631, at *5 (E.D. Tex. Feb. 18, 2025) (allowing plaintiff to pursue "§ 1981 claims through the remedial provision of § 1983 by specifically alleging that Individual Defendants violated . . . §§ 1981, 1983."); *Graham*, 587 F. App'x at 206 ("We have doubts about the district court's denial of Graham's section 1981 claim on the ground that she did not cite section 1983 as the procedural vehicle for asserting such a claim." (cleaned up)).

14

> any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

42 U.S.C. § 1983. "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quotation omitted).

To establish § 1983 liability against the Individual Defendants, Thomas "must (1) allege a violation of a right secured by the Constitution or laws of the United States" and (2) demonstrate that the Individual Defendants were "acting under color of state law." *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). There is no dispute that the Individual Defendants were acting under color of state law. Accordingly, the relevant question for each of Thomas's § 1983 claims is whether the alleged facts show "that the official violated a statutory or constitutional right." *al-Kidd*, 563 U.S. at 735.

The Individual Defendants assert that qualified immunity bars each of Thomas's § 1983 claims.

### 2.　*Qualified Immunity*

"Qualified immunity protects government officials from civil liability in their individual capacity to the extent that their conduct does not violate clearly established statutory or constitutional rights." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016).　It is a judicially created doctrine designed to avoid "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). The doctrine arises from "the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties." *Id.* (cleaned up).

"Once a defendant invokes qualified immunity, the burden shifts to the plaintiff to show that the defense is not available." *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010). A plaintiff seeking to overcome qualified immunity must

show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quotation omitted). "These steps may be considered in either order." *Shumpert v. City of Tupelo*, 905 F.3d 310, 320 (5th Cir. 2018).

The first step asks whether the alleged facts "show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If Thomas's allegations, viewed favorably, do not establish a constitutional violation, no further inquiry is necessary. *See id.* The second step "asks whether the right in question was clearly established at the time of the violation." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quotation omitted). The Individual Defendants are "shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotation omitted). "A right is clearly established only if the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Mote v. Walthall*, 902 F.3d 500, 505 (5th Cir. 2018) (quotation omitted). "[T]he salient question . . . is whether the state of the law" at the time of the incident provided the Individual Defendants with "fair warning that their alleged treatment of [Thomas] was unconstitutional." *Hope*, 536 U.S. at 741. Thomas bears a heavy burden on this prong because a right is clearly established only if relevant precedent has "placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

"[A] plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020) (quotation omitted). I will address each of Thomas's claims in turn, but I

16

must first begin by addressing the paucity of Thomas's allegations as to Reisner and Zerwas.

### 3.   *Thomas States No Claim Against Reisner or Zerwas*

"A Section 1983 claimant must establish that the defendant was either personally involved in the deprivation or that his wrongful actions were causally connected to the deprivation." *See Jones v. Lowndes County*, 678 F.3d 344, 349 (5th Cir. 2012). Thomas categorically cannot state any claim against Reisner or Zerwas because she advances no substantive allegations against them.

Thomas mentions Reisner only twice in the operative pleading—once to list his name in the style of the case and once to allege: "**Dr. Jochen Reisner** (President, UTMB) holds final authority over all employment decisions at UTMB, including terminations." Dkt. 77 at 18.

Thomas mentions Zerwas only thrice in the operative pleading—once to list his name in the style of the case and twice to allege: "**Dr. John Zerwas** (Chancellor, ad interim, The University of Texas System) is Chancellor of The University of Texas System and has system-wide authority over SB 17 implementation at all UT institutions" and "Dr. Zerwas set system-wide policies and directed how SB 17 was to be implemented, including determining standard and customary practices and procedures for handling DEI positions across UT System." *Id.*

Simply detailing Reisner and Zerwas' authority and responsibility are not factual allegations establishing that either individual was personally involved in or connected to the alleged deprivation of Thomas's statutory or constitutional rights. Because Thomas fails to advance any specific allegations concerning Reisner or Zerwas, both gentlemen are entitled to qualified immunity and Thomas's claims against them must be dismissed.

With that, I will address each of Thomas's § 1983 claims in turn, starting with her § 1981 claim for race discrimination in contracting.

17

#### 4.    § 1981 Race Discrimination in Contracting

Section 1981 provides in pertinent part that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). To state a claim for relief under § 1981, Thomas must allege that: (1) she is a member of a racial minority; (2) each Individual Defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute, such as the making and enforcement of a contract. *See Perry v. VHS San Antonio Partners, L.L.C.*, 990 F.3d 918, 931 (5th Cir. 2021). In addition, Thomas "bears the burden of showing that race was a but-for cause of [her] injury." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020).

Thomas, a Black individual, clearly satisfies the first element. The discrimination alleged also clearly satisfies the third element, as it pertains to the enforcement of Thomas's employment contract. Thus, I need to address only whether Thomas has pleaded facts to show that each of the remaining Individual Defendants—Woods, Mouton, Evans, and Susman—had an intent to discriminate against her on the basis of race and that Thomas's race was the but-for cause of her injury. Under this lens, I analyze Thomas's § 1981 claims with respect to each Individual Defendant.

Thomas alleges that Woods "transferred Dr. Thomas to her department; systematically excluded Dr. Thomas from work activities; admitted in September 2023 she had 'no position to offer' Dr. Thomas; blocked Dr. Thomas's proposed title change; and executed Dr. Thomas's termination notice." Dkt. 77 at 18.

Thomas alleges that Mouton "participated in decisions affecting Dr. Thomas's position; received Dr. Woods's email blocking Dr. Thomas's title change

proposal; received copy of Dr. Thomas's title change proposal; and had authority to direct alternative solutions." *Id.*

Thomas alleges that Evans "made decisions about implementing [Thomas's] termination" and "had authority to ensure that standard and customary practices and procedures were followed and had authority to direct nondiscriminatory treatment." *Id.* at 19.

Thomas alleges that Susman, "in collusion with Dr. Woods requested Dr. Torres falsify Dr. Thomas's performance evaluation"; "coordinated with Dr. Woods to transfer Dr. Thomas to an office without available positions"; provided "false assurances of support" to Thomas; "had knowledge of the scheme to terminate Dr. Thomas"; and "had authority to prevent the discrimination" against Thomas. *Id.*

In addition to these person-specific allegations, Thomas alleges generally that the "Individual Defendants predetermined her termination based on race"; "Individual Defendants denied her accommodations offered to non-minority employees in standard and customary manner"; and "Individual Defendants systematically excluded her from work opportunities afforded to non-minority colleagues." *Id.* at 27.

None of these allegations, alone or in combination, suggest that Thomas would not have been terminated but-for her race. In fact, Thomas's own allegations suggest that the treatment she received was based on something other than race. For example, Thomas alleges that Dr. Cindy West, the Director of Student Engagement at UTMB's School of Nursing and a Black woman,[12] "did not lose [her] employment, but [was] given other job responsibilities to absorb the percentage time [she] had spent in DEI related activities." Dkt. 77 at 15. That another Black woman received favorable treatment suggests that whatever the reason for

---

[12] *See* Accomplishments Overview, Cindy West, UTMB School of Nursing, https://nursing.utmb.edu/About/Faculty/Biography/ciwest (last visited Mar. 10, 2026). "[G]overnmental websites are proper sources for judicial notice," and "a court may take judicial notice of . . . a governmental website without converting a motion to dismiss into a motion for summary judgment." *Cicalese*, 456 F. Supp. 3d at 871.

Thomas's different treatment, it was not based on race.[13] Accordingly, Thomas fails to state a § 1981 claim, meaning that every Individual Defendant is entitled to qualified immunity from and dismissal of Thomas's § 1981 claim.

### 5. Fourteenth Amendment Race Discrimination

Thomas alleges that she was treated differently than unidentified, non-minority colleagues and Torres, and that her proposed accommodation was blocked while identical accommodations were offered to unidentified, non-minority employees in a standard and customary manner. *See* Dkt. 77 at 28. The Individual Defendants retort that Thomas "presents no violation of her right to equal protection because she does not allege facts to suggest that anyone outside of her protected class received different treatment than she did under similar circumstances." Dkt. 79 at 22.

The Equal Protection Clause prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "To maintain an equal protection claim, a plaintiff typically alleges that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 212 (5th Cir. 2009) (quotation omitted). "[T]o state a claim of racial discrimination under the Equal Protection Clause and § 1983, a plaintiff must demonstrate that the governmental official was motivated by intentional discrimination on the basis of race." *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).

As discussed above, Thomas has not alleged facts that would give rise to a plausible inference that any differential treatment she received was based on her race. Thus, Thomas has not stated a constitutional violation, and Individual

---

[13] To the extent that Thomas would complain that Dr. West is not a proper comparator, that raises the separate problem, discussed above in connection with Thomas's Title VII claims, that Thomas has not identified any similarly situated comparators whose treatment would give rise to the plausible inference that there was discriminatory motive, much less but-for causation.

Defendants are entitled to qualified immunity from Thomas's Fourteenth Amendment race discrimination claim.

### 6.   *First Amendment Retaliation*

Thomas alleges that "Individual Defendants retaliated against Dr. Thomas for filing her EEOC charge by mailing her termination extension letter on January 23, 2024 (six days after charge)," and by terminating her employment on February 28, 2024. Dkt. 77 at 29. Individual Defendants contend that filing a Charge is not protected speech under the First Amendment. *See* Dkt. 79 at 22.

To establish a First Amendment retaliation claim, Thomas "must establish that: (1) she suffered an adverse employment action; (2) her speech involved a matter of public concern; (3) her interest in commenting on matters of public concern outweighs the employer's interest in promoting efficiency; and (4) her speech motivated the employer's adverse action." *McLin v. Twenty-First Jud. Dist.*, 79 F.4th 411, 419 (5th Cir. 2023) (quotation omitted).

"[W]hen [a public employee] speaks as an employee on matters that address only [her] personal employment conditions, [s]he is not protected from discharge for engaging in that speech by the First Amendment." *Ayoub v. Tex. A & M Univ.*, 927 F.2d 834, 837 (5th Cir. 1991). "Lodging a complaint with the EEOC, without further airing of grievances, creates a private, personal dispute between employer and employee. It does not create a generalized petition for a remedy to a public problem." *Short v. City of W. Point*, No. 97-60086, 1997 WL 575048, at *1 (5th Cir. Aug. 29, 1997).

Here, because Thomas's Charge was made "in furtherance of a private employment dispute," it is not speech that is protected by the First Amendment. *Bates v. Univ. of Tex. Med. Branch*, 425 F. Supp. 2d 826, 847 (S.D. Tex. 2003). There is nothing about the Charge that implicates a public concern. Thomas did not file her Charge as a "crusader[] for public justice" but rather as an individual employee "seeking employment benefits to which [she] believed [she] w[as] entitled." *Id*; *see also* Dkt. 77 at 33 (Thomas seeking restoration of "all employment

benefits and rights" as a professor). Thus, Thomas has not alleged the second element a First Amendment retaliation claim.

Thomas also has not alleged the fourth element of a First Amendment retaliation claim—that filing a Charge motivated UTMB to terminate her—for the same reasons that Thomas fails to plead a Title VII retaliation claim. UTMB clearly decided to terminate Thomas's employment well in advance of any protected activity or speech.

Because Thomas fails to state a First Amendment retaliation claim, the Individual Defendants are entitled to qualified immunity from and dismissal of Thomas's First Amendment retaliation claim.

### 7.    *Fourteenth Amendment Due Process*

As to her Fourteenth Amendment due process claim, Thomas alleges that "Dr. Thomas had a property interest in her continued employment at UTMB under the terms of her position and the representations made to her." Dkt. 77 at 30. Individual Defendants argue that Thomas does not have a constitutional right in continued employment at UTMB. *See* Dkt. 79 at 21.

"[T]o advance a due process claim in connection with [her] termination, [Thomas] must point to some state or local law, contract or understanding that creates a property interest in [her] continued employment." *Cabrol v. Town of Youngsville*, 106 F.3d 101, 105 (5th Cir. 1997). "In Texas, there exists a presumption that employment is at-will unless that relationship has been expressly altered in one of two ways. The at-will relationship may be altered by contract; or by express rules or policies limiting the conditions under which an employee may be terminated." *Muncy v. City of Dallas*, 335 F.3d 394, 398 (5th Cir. 2003) (cleaned up).

Thomas does not point to any contractual provision, rule, or policy that creates a property interest in her continued employment at UTMB. "Absent a property interest, there is nothing subject to due process protections and [my] inquiry ends." *Cabrol*, 106 F.3d at 105. Because Thomas cannot demonstrate the

basis of a property interest in her continued employment at UTMB, she cannot state a due process claim. Accordingly, Individual Defendants are entitled to qualified immunity from and dismissal of Thomas's due process claim.

### 8. *Conspiracy*

Thomas alleges that "Individual Defendants conspired to violate [her] rights under Equal Protection, First Amendment, and Due Process Clauses." Dkt. 77 at 32. Individual Defendants assert that because Thomas "does not abrogate the qualified immunity of any of the Individual Defendants, the claims against them should be dismissed." Dkt. 79 at 23.

"To state a claim for conspiracy under § 1983, a plaintiff must allege the existence of (1) an agreement to do an illegal act and (2) an actual constitutional deprivation." *Bevill v. Fletcher*, 26 F.4th 270, 274–75 (5th Cir. 2022). In other words, Thomas's conspiracy claim rises or falls with her other constitutional claims. Because Thomas has not stated any constitutional violation, she cannot state a claim for conspiracy to violate her constitutional rights. The Individual Defendants are entitled to qualified immunity from Thomas's conspiracy claim.

### C. INJUNCTIVE RELIEF

Thomas asks the court to "[i]ssue injunctive and declaratory relief." Dkt. 77 at 33. Defendants argue that Thomas "does not present a viable claim under Title VII" or "under 42 U.S.C. § 1981 or § 1983." Dkt. 79 at 19. For all the reasons stated above, I agree. "[B]ecause [Thomas] states no viable cause of action, injunctive relief is unwarranted." *Sahara Health Care, Inc. v. Azar*, 349 F. Supp. 3d 555, 579 (S.D. Tex. 2018), *aff'd*, 975 F.3d 523 (5th Cir. 2020).[14]

### CONCLUSION

For the reasons discussed above, I recommend that Defendants' Second Motion to Dismiss Plaintiff's Second Amended Complaint (Dkt. 79) be granted.

---

[14] Because Thomas's failure to state a Title VII or § 1983 claim means that she is not entitled to injunctive relief, I do not reach Defendants' arguments regarding the *Ex parte Young* exception to Eleventh Amendment immunity.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. *See* 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(2). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.

SIGNED this __18th__ day of March 2026.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE

24